# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD HONGSERMEIER; FIORELLA
HONGSERMEIER,
                          *Petitioners,*

            v.

COMMISSIONER OF INTERNAL
REVENUE,
                          *Respondent.*

No. 07-72828

Tax Ct. No.
29643-86

RICHARD B. ROGERS; DONNA G.
ROGERS,
                  *Petitioners-Appellants,*

            v.

COMMISSIONER OF INTERNAL
REVENUE,
                  *Respondent-Appellee.*

No. 07-73718

Tax Ct. No.
17993-95

JOHN L. HUBER; TERRY E. HUBER,
                          *Petitioners,*

            v.

COMMISSIONER OF INTERNAL
REVENUE,
                          *Respondent.*

No. 07-73719

Tax Ct. No.
20119-84

13183

STANLEY C. TITCOMB; SHARON A. TITCOMB,

　　　　　*Petitioners-Appellants,*

　　　　　v.

COMMISSIONER OF INTERNAL REVENUE,

　　　　　*Respondent-Appellee.*

No. 07-73818

Tax Ct. No. 17992-95

NORMAN W. ADAIR; BARBARA L. ADAIR,

　　　　　*Petitioners-Appellants,*

　　　　　v.

COMMISSIONER OF INTERNAL REVENUE,

　　　　　*Respondent-Appellee.*

No. 07-73822

Tax Ct. Nos. 17642-83 38965-84 35608-86 479-89 8070-90

GLORIA K. OWENS; TERRY D. OWENS,

　　　　　*Petitioners,*

　　　　　v.

COMMISSIONER OF INTERNAL REVENUE,

　　　　　*Respondent.*

No. 07-73823

Tax Ct. No. 40159-84

HOYT W. YOUNG; BARBARA D. YOUNG,

    *Petitioners-Appellants,*

v.

COMMISSIONER OF INTERNAL REVENUE,

    *Respondent-Appellee.*

No. 07-73825

Tax Ct. Nos.
4201-84
22783-85
30010-85

OPINION

Appeal from a Decision of the Tax Court

Argued and Submitted
November 4, 2009—Seattle, Washington

Filed September 1, 2010

Before: Ferdinand F. Fernandez, Andrew J. Kleinfeld and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton

## COUNSEL

Michael Louis Minns, Houston, Texas, for petitioners Richard and Fiorella Hongsermeier.

Joe Alfred Izen, Jr., Bellaire, Texas, for petitioners Norman W. and Barbara L. Adair, Terry D. and Gloria K. Owens, and Hoyt W. and Barbara D. Young.

Robert Patrick Sticht, Los Angeles, California, for petitioners Richard B. and Donna G. Rogers, John L. and Terry E. Huber, and Stanley C. and Sharon A. Titcomb.

Nathan J. Hochman, Richard Farber, and John A. Dudeck, Jr. (argued), U.S. Department of Justice, Washington, D.C., for the respondent.

---

**OPINION**

CLIFTON, Circuit Judge:

Petitioners are representatives of a group of taxpayers who have previously been before our court. The taxpayers participated in a tax shelter that was challenged by the government and became the subject of litigation before the Tax Court. Misconduct by government attorneys tainted that litigation. Specifically, a case was tried before the Tax Court involving "test case" taxpayers selected by the larger group of taxpayers and by the government. It was discovered after the Tax Court announced its decision from the test case that government attorneys had previously reached a settlement with one taxpayer but withheld that information from the court and from the other taxpayers so that evidence advantageous to the government could be elicited from the taxpayer during the Tax Court trial. This Court held in *Dixon v. CIR*, 316 F.3d 1041, 1047-48 (9th Cir. 2003), that the misconduct constituted fraud on the court, and we remanded the cases to the Tax Court for entry of judgment on terms equivalent to those provided to the taxpayer who was party to the secret settlement. We left it to that court to determine what the precise terms should be. The Tax Court rendered its decision, *Dixon v. CIR*, 91 T.C.M.

(CCH) 1086, 2006 WL 1157520, and it was again appealed by the taxpayers. That is the appeal now before us. We affirm the Tax Court's determination of petitioners' remaining federal income tax deficiencies and liability for underpayment of interest.

## I.  Background

### A.  *Prior Factual and Procedural History*[1]

During the 1970s and 1980s, a group of individual taxpayers participated in an investment program and tax shelter designed and administered by Honolulu businessman Henry Kersting ("Kersting"). The investments, which came to bear Kersting's name, consisted of a somewhat complicated program in which participants purchased stock with loans from Kersting-controlled entities financed by two layers of promissory notes.[2] Kersting marketed the product as a legitimate investment which would enable participants to claim interest deductions on their individual tax returns. When Kersting participants claimed those deductions,[3] the IRS issued notices of deficiency, disallowing all interest deductions taken, and reasoning that the underlying transactions were shams, the interest was not "paid or properly accrued," and the notes did not constitute a bona fide indebtedness.

---

[1]This portion of the background narrative is taken from our prior decision in *Dixon*, 316 F.3d at 1043-46.

[2]The Kersting investment consisted of the following: (i) corporate stock or stock subscription rights or investment certificates purchased by a loan from a Kersting company (a "Primary Note"); (ii) prepayment of interest on the Primary Note financed by a secondary or "leverage" note from another Kersting entity at a lower interest rate than the Primary Note; (iii) principal on the Primary Note paid by surrender of the stock or other underlying asset; and (iv) interest on the Primary Note paid by a distribution from the corporation whose stock was purchased with the Primary Note. *Dixon v. CIR*, 62 T.C.M. (CCH) 1440, 1454-62 (1991) (original Tax Court opinion).

[3]Deductions were claimed pursuant to 26 U.S.C. § 163.

In a Tax Court action brought by Kersting on their behalf, program participants sought a redetermination of the deficiencies. Recognizing that the sheer number of affected taxpayers (approximately 1,800) made it impractical to try each case individually, the parties agreed to employ a "test case" approach to determine liability. To facilitate this process, the bulk of affected taxpayers signed stipulations ("piggyback agreements") agreeing to be bound by the decision of a test case trial involving representative taxpayers. The agreed-upon process provided that two representatives would be chosen by the taxpayers' attorneys and five by IRS attorneys. Approximately 1,300 taxpayers, some 500 already having settled, signed on to the piggyback agreements.

The test cases proceeded to a consolidated one-month trial before the Tax Court sitting in Honolulu. The Tax Court ultimately concluded that the taxpayers were liable for all assessed deficiencies and would be required to pay additional negligence and tax-motivated transaction penalties. Crucial to this determination was the testimony of John R. Thompson ("Thompson"), the only taxpayer who testified that he believed the instruments creating the claimed interest would not be enforced.

As it turns out, that which the Tax Court and other participants believed to be a legitimate, representative proceeding, binding on the test case petitioners and all those waiting in the wings, was anything but. Some time prior to the test case trial, Kenneth W. McWade ("McWade"), the IRS attorney trying the case, and William A. Sims ("Sims"), the IRS attorney with supervisory authority over it, had entered into secret settlement agreements with Thompson and another test case petitioner, John R. Cravens ("Cravens"). Cravens was one of the taxpayer-selected test case representatives, chosen by taxpayer counsel because his payment of capital gains taxes upon exiting the Kersting investment program made him a particularly good representative.

A condition of their settlements required Thompson and Cravens to remain test case petitioners. McWade also convinced Cravens, who mistakenly believed his liability was finalized by the settlement, to proceed *pro se*. With respect to Thompson,[4] McWade agreed to have Thompson's tax deficiencies reduced in proportion to his attorney's fees, which exceeded $60,000. At no point did McWade or Sims reveal to the Tax Court or to any other taxpayer representative that two of the test case petitioners' cases had been settled, much less reveal the conditions imposed on them.

The deception continued with a cover-up, which was carefully designed to prevent the Tax Court and other taxpayers from learning of the secret settlement agreements. At Kersting's deposition, which McWade attended, Kersting's lawyer objected to the presence of Thompson's attorney because of rumors that Thompson was attempting to settle. Knowing that Thompson had, in fact, already settled, McWade remained silent. McWade then misled the Tax Court by failing to disclose the settlement when he moved to set aside the Thompson piggy-back agreement, a pre-trial motion necessary to ensure Thompson's status as a test case petitioner. Deceptive silence matured into overt misconduct when, during the course of the test case trial, it became apparent that Thompson was going to testify about his settlement. McWade quickly shifted his questions to unrelated matters.[5]

---

[4]Thompson had an ongoing dispute with Kersting over the validity of the investment certificates. Specifically, Kersting had threatened to initiate collection proceedings against Thompson. Therefore, Thompson had an interest in seeing that the certificates of investment were declared invalid and unenforceable. DeCastro, Thompson's attorney, used the test case proceeding to elicit testimony from Thompson regarding the sham nature of the notes in order to bolster Thompson's position in any subsequent litigation with Kersting.

[5]In the Tax Court proceedings on remand, Judge Beghe pointed to the following exchange as evidence of deception:

Mr. Thompson: The procedure went through a tax firm in Los Angeles known as Loeb & Loeb, and I wound up with the

McWade and Sims also secured an agreement with tax-payer Dennis Alexander[6] ("Alexander") whereby the IRS would reduce Alexander's tax deficiencies in exchange for testimony and trial preparation assistance. In accordance with this agreement, the IRS paid for Alexander's expenses in Hawaii for the length of the trial. McWade then filed a memorandum regarding the basis for the settlement of Alexander's tax liabilities which the Tax Court later found to be false. During the test case trial, McWade also sat silently through testimony by Alexander that he knew to be false.[7]

---

> DeCastro Law Corporation by way of their direction, and made several discoveries that were startling to me. And of course, I settled. To be quite honest, I had to get out of this. I was not going to spend my life—
>
> Mr. McWade: Well, let me—
>
> Mr. Thompson:—doing all this.
>
> Mr. McWade: Let me stop you here for a moment.
>
> Mr. Thompson: Okay, I'm sorry. I beg your pardon.
>
> Mr. McWade: Mr. Thompson, can you tell me: have we been successful in getting the lien removed from your house?

Thompson's use of the word "settled" did not disclose the secret settlement between Thompson and the IRS because, in the original proceeding, Judge Goffe mistakenly interpreted the remark as referring to resolution of the Thompsons' tax liability for another year which was not at issue. *Dixon v. CIR*, 77 T.C.M. (CCH) 1630, n.55. McWade did nothing to disabuse the court of its interpretation.

[6]Alexander was then embroiled in a legal battle with Kersting involving more than $4 million. Alexander's animus towards Kersting was made clear in a letter to the IRS ("When the Nazi knows that 1400 of his clients are going to be clobbered and that he will have the Criminal Investigative Division of the IRS coming down on him, I think he will be inclined to pay me my money.").

[7]When one of the attorneys for the taxpayers asked Alexander if McWade had discussed a reduction of Alexander's tax deficiency in exchange for his testimony, Alexander responded, "Specifically, no." McWade failed to correct this patently false statement.

The Tax Court's test case determination left the remaining taxpayers—those who had signed on to the piggyback agreements—subject to judgment on the same adverse terms. This is when the McWade-Sims house of cards began to collapse. Thompson and Cravens, who had sat silent while the Tax Court entered judgment against them, pressured McWade and Sims to live up to the terms of their secret settlement agreements. It was now clear that the IRS would have to move to set aside the Thompson and Cravens judgments; McWade and Sims were forced to reveal the secret settlements necessitating the Tax Court's entry of "revised" judgments in favor of Thompson and Cravens.

After being asked to approve the set aside motions, senior IRS officials determined that McWade and Sims had engaged in active misconduct and informed the Tax Court of the secret settlements,[8] asking for an evidentiary hearing to determine the extent of the damage. The Tax Court refused to hold an evidentiary hearing and proceeded to enforce the terms of the Thompson and Cravens settlements. The taxpayers appealed the refusal to this Court, which remanded with instructions to hold an evidentiary hearing. *Dufresne v. CIR*, 26 F.3d 105 (9th Cir. 1994).

On remand, the Tax Court conducted the mandated evidentiary hearing. Incredibly, McWade's pattern of deception continued with his persistent denial that the Thompson settlement was a vehicle for paying Thompson's attorneys' fees and his testimony that the Thompson settlement was attributable to a separate transaction. After making extensive findings concerning the government's misconduct, the Tax Court surprisingly concluded that what had occurred was harmless error. While the bulk of the decision from the original test case pro-

---

[8]As the Tax Court proceeding on remand revealed, this disclosure was anything but complete, excluding, for example, the arrangement to "pay" (through a reduction in disallowed deductions) $60,000 to Thompson for his attorney fees.

ceeding was reinstated, the Tax Court did relieve the taxpayers of that portion of the original judgment which imposed increased interest penalties for negligence and "tax motivated transactions" and imposed costs and attorneys' fees on the IRS. From the Tax Court's refusal to vacate the adverse judgments against them, the taxpayers filed an appeal to this Court, which resulted in our *Dixon* decision.

*B.   Our Decision in* Dixon

In *Dixon* we held that the IRS counsel committed intentional fraud on the Tax Court and the taxpayers:

> There can be no question here but that the actions of McWade and Sims amounted to a fraud on both the taxpayers and the Tax Court. The Tax Court believed it was hearing a legitimate adversarial dispute when, in fact, the proceeding was a charade fraught with concealed motives, hidden payments, and false testimony. What did occur was clearly designed to defile the court itself, and there is no question that it was carried out by an officer of the court.

*Dixon*, 316 F.3d at 1046-47. We further concluded that the taxpayers were not required to demonstrate prejudice in order to obtain relief. The Tax Court's determination that the misconduct had been harmless to other taxpayers was set aside as an abuse of discretion.

We then set forth our conclusion as to the appropriate remedy. Because the adherence of the Tax Court on remand to our instructions is a major issue in the current appeal, we will quote in full the "Remedy" portion of our decision in *Dixon*, omitting citations and one of the two footnotes. The second footnote, note 11, is critical to our decision in the current appeal. It appears at the end of the quoted passage, and we include it at the end:

We have the inherent power to vacate the judg-
ment of the Tax Court, fashion an appropriate rem-
edy and sanction a party or its lawyers for willful
abuse of the judicial process, particularly when the
party or its lawyers have intentionally practiced a
fraud upon the court. This power, however, is to be
"exercised with restraint and discretion."

Here, it plainly would be unjust to remand for a
new, third trial. The IRS had an opportunity to pres-
ent its case fairly and properly. Instead its lawyers
intentionally defrauded the Tax Court. The Tax
Court had two opportunities to equitably resolve this
situation and failed. Enormous amounts of time and
judicial resources have been wasted. In addition, the
IRS has done little to punish the misconduct and
even less to dissuade future abuse. The taxpayers
should not be forced to endure another trial and the
IRS should be sanctioned for this extreme miscon-
duct.

Conversely, we will not enter judgment eradicat-
ing all tax liability of these taxpayers. Such an
extreme sanction, while within the court's power, is
not warranted under these facts. Instead, we remand
to the trial court with directions to enter judgment in
favor of Appellants and all other taxpayers properly
before this Court on terms equivalent to those pro-
vided in the settlement agreement with Thompson
and the IRS. n.11

> n.11. We leave to the Tax Court's discre-
> tion the fashioning of such judgments
> which, to the extent possible and practica-
> ble, should put these taxpayers in the same
> position as provided for in the Thompson
> settlement.

*Id.* at 1047.

## C. The Tax Court's Decision on Remand

The task our decision in *Dixon* assigned to the Tax Court was not a purely mechanical one. All the affected taxpayers participated in the Kersting tax shelters, but their tax returns differed in other respects and some of those differences raised separate issues. The Thompson tax returns were among those that raised other issues, and the Thompson settlement resolved more than Kersting tax shelter claims.

In order to put other taxpayers "in the same position as provided for in the Thompson settlement," *id.* at 1047 n.11, the Tax Court was required to translate the overall Thompson settlement into the different contexts presented by the tax returns of other taxpayers. It also had to decide how to treat the portion of the Thompson settlement that reduced Thompson's tax liability by the amount of his attorney's fees he paid for participating in the charade of a trial, since that did not represent an actual net savings by Thompson. With the discretionary nature of the Tax Court's decision in mind, the Commissioner argued to the Tax Court that the affected taxpayers should receive a 20 percent reduction in their tax deficiencies, while the taxpayers argued for a 100 percent or near 100 percent reduction in their deficiencies.

The Tax Court was also required to deal with the reality that both the tax laws and interest rates have changed over the years. The Tax Court noted in its order that "[t]he Thompson settlement was embodied in a sequence of payments and refunds that occurred more than 15 to 20 years ago, when personal interest was fully or partially deductible for income tax purposes, in a different interest rate environment, and in temporal relationships that are not now reproducible with respect to any of the other petitioner participants in the Kersting project." *Dixon*, 91 T.C.M. (CCH) 1086, 2006 WL 1157520, at *26.

The Tax Court's effort was further complicated by the fact that there was no comprehensive written agreement documenting the terms of the Thompson settlement. There was a written agreement at one point, but it was subsequently modified, culminating in an oral agreement between the IRS attorneys and the attorney for Thompson. That meant, among other things, that it was not clear which resolutions were reached concerning various non-Kersting issues over several tax years, including years not otherwise connected with the Kersting tax shelter, related to the Kersting shelter settlement and which, if any, were independent of the settlement.

The Tax Court ultimately determined that the "Kersting-related deficiencies" for each affected taxpayer should be reduced by 63.37 percent, thereby requiring taxpayers to pay 36.63 percent of the income tax they allegedly otherwise would have owed. *Id.* at 47. The Tax Court calculated this percentage by constructing a fraction with a numerator representing the tax actually paid by Thompson and a denominator reflecting Thompson's alleged tax liability absent the settlement. Specifically, the Tax Court used a numerator of $30,000, representing the portion of the total deficiencies that was actually paid by Thompson over the 1979-1981 period.[9] The denominator was calculated by starting with $79,294, the sum of the deficiencies initially asserted against Thompson by the Commissioner for the tax years in question, 1979-1981. To that amount was added two additional benefits received by Thompson: (a) an adjustment of $980 representing a deficiency in Thompson's 1983 tax that the IRS did not assess and Thompson did not pay, and (b) an adjustment of $1,624 representing a tax savings by Thompson attributable to the Commissioner's allowance of a 1987 personal interest deduction that was overstated by $5,814. Summing those figures produced a total denominator of $81,898. Dividing $30,000 by $81,898 produced a fraction equivalent to 36.63 percent,

---

[9]The Tax Court declined to include within the numerator the amounts paid by Thompson for attorney's fees.

representing the proportion of tax the Tax Court found had been paid by Thompson. *Id.* That meant that the settlement reduced what he was required to pay in taxes in connection with the Kersting shelter by 63.37 percent.

The Tax Court also addressed a separate tax program, the Bauspar program, through which Thompson and certain other Kersting project participants "apparently deducted substantial amounts as home mortgage interest on their 1983-85 returns, on the basis of payments under the Bauspar program that may not have met the requirements for deductible home mortgage interest." *Id.* at 40. Finding that the benefit Thompson derived from overstated Bauspar interest deductions was not readily ascertainable because the payees of claimed mortgage interest are not identified in the returns and that the Commissioner disallowed Bauspar deductions only sporadically for a small number of taxpayers, the Tax Court determined that it was not appropriate to deal with the Bauspar program as part of its calculation of the percentage deduction that would apply to all taxpayers. *Id.* Rather the court directed that "any disallowed deductions relating to Bauspar are to be treated as valid deductions with respect to those taxpayers who may have claimed them" because "[t]hat's the way Bauspar played out for the Thompsons . . . ." *Id.* at 47.

The Tax Court also accorded other benefits to the taxpayers under the *Dixon* mandate. Noting that many Kersting participants had remaining penalties and additions and "[i]t seems especially incongruous to impose an addition for a few months' delay in filing a return at this time, when 25 years have passed since that delay occurred," the Tax Court concluded that "[a]ll affected taxpayers are to be relieved of all penalties and additions to tax that were determined in their statutory notices of deficiency, not just Kersting-related items such as negligence additions." *Id.* The Tax Court also found that approximately 100 Kersting taxpayers had non-Kersting-related deficiencies, and, again noting the long delay in resolving this matter, the court directed that "all non-

Kersting-related deficiencies determined in the notices of deficiency for all affected taxpayers with taxable years still before this Court be eliminated." *Id.*

The Tax Court also noted areas of agreement where all parties "establish[ed] some common ground regarding the relief to which those beneficiaries are entitled." *Id.* at 32. The court accepted the parties' stipulation that the Thompson settlement involved a "burnout" element that effected a reduction in the underpayment of interest that would otherwise arise under I.R.C. § 6601.[10] *Id.*

The government did not appeal the Tax Court's judgment. Taxpayers filed this timely appeal. We have jurisdiction pursuant to 26 U.S.C. § 7482.

Petitioners Richard and Fiorella Hongsermeier, Terry and Gloria Owens, and Hoyt and Barbara Young served as test case petitioners in the original litigation before the Tax Court, while petitioners Norman and Barbara Adair, Richard and Donna Rogers, John and Terry Huber, and Stanley and Sharon Titcomb initially entered into "piggy-back" agreements to be bound by the Tax Court's determination in the test cases. The Adairs, Owens, and Youngs consolidated their cases on appeal to this Court, as did the Rogers, Hubers, and Titcombs. We consolidated all cases for the purposes of oral

---

[10]The Tax Court opinion explained the "burnout" element as follows:

(a) for taxpayers with 2-3 taxable years before the court, the first year's deficiencies are shifted forward and combined with the deficiencies in the second year then reduced in accord with the Ninth Circuit's mandate; and

(b) for taxpayers with 4 or more taxable years before the court, the first year's deficiencies are shifted forward to the second year and the second year's deficiencies are shifted forward and combined with the deficiencies in the third year, after which all deficiencies are reduced in accord with the Ninth Circuit's mandate.

*Dixon*, 91 T.C.M. (CCH) 1086, 2006 WL 1157520, at *32.

argument, and now resolve the appeals in all of the cases in this opinion.

## II. Discussion

We review the Tax Court's conclusions of law de novo, its factual findings for clear error, and its discretionary rulings for abuse of discretion. *Kelley v. CIR*, 45 F.3d 348, 350 (9th Cir. 1995). The Tax Court's evidentiary rulings are reviewed for abuse of discretion and will not be reversed absent a showing of prejudice. *Sparkman v. CIR*, 509 F.3d 1149, 1156 (9th Cir. 2007).

### A. *The Tax Court's Remedy*

We conclude that the Tax Court's findings are well supported in its comprehensive review of the record and do not leave "the definite and firm conviction that a mistake has been committed." *Sparkman*, 509 F.3d at 1155 (quotation marks omitted). The Tax Court's determination of the percentage deduction in the taxpayers' deficiencies, plus other benefits, accords with this Court's mandate in *Dixon* and is not an abuse of discretion. *See Jim Turin & Sons v. CIR*, 219 F.3d 1103, 1105 (9th Cir. 2000)("[W]e independently review for abuse of discretion, and our task is to determine whether [the exercise of discretion] is clearly unlawful or plainly arbitrary." (footnote omitted)).

Taxpayers argue that the Tax Court's remedy fails to comply with the *Dixon* mandate and challenge, in various ways, the Tax Court's calculation of the 63.37 percent figure.

### B. *Elimination of Taxpayers' Deficiencies*

The Hongsermeiers first argue that the taxpayers' refunds should be accepted as filed to allow a 100 percent reduction in their tax deficiencies based on this Court's finding in *Dixon* of fraud on the court, continued fraud on the court on the part

of the Commissioner following *Dixon*, and a lack of complete information concerning the Thompson settlement.

**[1]** This Court has the power to vacate or amend a judgment of the Tax Court and to fashion an appropriate remedy upon a finding of fraud on the court. *See In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999). *In Dixon*, we did indeed find that "the taxpayers . . . clearly and convincingly demonstrated fraud on the court and are entitled to relief." 316 F.3d at 1047. We specifically chose, however, to "not enter judgment eradicating all tax liability of these taxpayers." *Id*. The option of a 100 percent reduction in taxpayers' deficiencies was already rejected by this Court, which noted that "[s]uch an extreme sanction, while within the court's power, is not warranted under these facts." *Id*. We instead remanded the case to the trial court, leaving to the Tax Court's discretion the fashioning of a settlement for the affected taxpayers equivalent to that offered to Thompson. The Tax Court followed our mandate by not eliminating all tax liability for the taxpayers, and properly so. A trial court is prohibited from giving relief beyond the scope of an appellate mandate. *See Caldwell v. Puget Sound Elec. Apprenticeship & Training Trust*, 824 F.2d 765, 767 (9th Cir. 1987).

**[2]** The Hongsermeiers' argument that further fraud on the court following *Dixon*, or, in the alternative, unconscionable bad faith, should prompt this Court to vacate the Tax Court's judgment and eliminate 100 percent of taxpayers' deficiencies is also flawed. The Hongsermeiers contend that the Commissioner's representation on remand that Thompson received only a 20 percent reduction in his tax deficiencies was not only false, but also contradicted two previous statements: the first, by Sims in a 2003 state bar disciplinary proceeding stating that the Thompson settlement was a 50 percent reduction in tax deficiencies, and the second, by the former Chief of the Appellate Section of the Department of Justice's Tax Division, reporting in 1992 that Thompson received a 65 percent reduction in deficiencies.

**[3]** While, as previously noted, we may vacate the Tax Court's judgment upon a finding of fraud on the court, there is no evidence in the record that, following *Dixon*, the Commissioner acted in a manner at all amounting to "an unconscionable plan or scheme which is designed to improperly influence the court in its decision*." England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960) (defining fraud on the court). The Commissioner simply argued on remand that the Thompson settlement amounted to a 20 percent reduction in what Thompson had to pay because the Commissioner explicitly disregarded reductions Thompson used to pay his attorney's fees as not representing a net savings to Thompson. Attorney's fees of other taxpayers were paid for by Kersting, the promoter of the tax shelter. While the Tax Court rejected that argument, the Commissioner's position did not constitute fraud on the court or bad faith, nor was it related to the fraud initially perpetrated by Sims and McWade.

## C. Calculation of the Tax Court's Remedy

**[4]** Taxpayers also argue that the Tax Court's calculation of the 63.37 percent figure did not take into account the full benefits offered to Thompson. Specifically, the Hongsermeiers argue that the Court should order a 90.1 percent reduction of their deficiencies, and the Adairs, Owens, and Youngs argue that the Court should order a 98 percent reduction of their deficiencies.

The Hongsermeiers base their calculation of the terms of the Thompson settlement on a letter from Sims to Thompson's attorney, dated May 29, 1992, estimating that the taxes Thompson owed, plus statutory additions and interest, would be "approximately $302,396.12." The Hongsermeiers used the numerator of $30,000, representing the total deficiencies paid by Thompson over the 1979-1981 period, and divided that number by a denominator of $302,396.12 to produce the 90.1 percent figure.

**[5]** It is undisputed that the total tax deficiencies asserted against Thompson for the years 1979-1981 was $79,294, and that Thompson's final settlement reduced those deficiencies to $30,000. The alternative denominator offered by the Hongsermeiers in this appeal is based on their vague contention that various additions, interest, and penalties should be included in the denominator of the Thompson settlement fraction. As discussed above, the Tax Court did add two figures to the denominator based on additional benefits received by Thompson: (a) $980 to represent the unpaid deficiency in Thompson's 1983 tax, and (b) $1,624 to represent Thompson's tax savings due to the Commissioner's allowance of an overstated personal interest deduction for 1987. The Tax Court therefore determined that the appropriate denominator was $81,898.

**[6]** The $302,396.12 figure asserted by the Hongsermeiers does not represent the reduction in Thompson's actual liability in comparison to the amount they were able to pay in settlement because it does not take into account advance payments that Thompson made in 1986 and 1987 of $121,770 in both tax and interest owed. Thompson did not "save" amounts he actually paid. The Tax Court did not relieve the taxpayers of interest liability because, as discussed below, Thompson paid his interest in full. *See infra* Part II, E.

The Hongsermeiers also separately assert that the Tax Court should have increased the denominator of the Thompson settlement fraction by $4,934.32 to include the late filing addition in Thompson's statutory notice of deficiency for 1981, which Thompson would have been required to pay had he not settled his tax liabilities. Rather than give a credit or add this figure to the denominator of the Thompson settlement fraction, the Tax Court instead chose to eliminate all penalties related to non-Kersting additions for all affected taxpayers. Noting that taxpayers' "proposed application of non-Kersting penalties and additions was specific to individual taxpayers, unlike the Kersting-related deficiencies and addi-

tions for which all affected taxpayers are liable," the Tax Court found that it was appropriate to limit the benefit of relief from non-Kersting additions to those affected taxpayers who, like Thompson, were subject to non-Kersting additions. *Dixon*, 91 T.C.M. (CCH) 1086, 2006 WL 1157520, at *36.

Certain taxpayers, including the Hongsermeiers, did not have any additional non-Kersting-related penalties asserted against them. The Tax Court's decision to eliminate all non-Kersting penalties was well within the Tax Court's mandated discretion, however, for the Tax Court was not required to fashion individual remedies for taxpayers based on their lack of non-Kersting-related additions. The Tax Court noted in its decision that "memories have faded and records have been lost or destroyed during the long delay in resolution of the Kersting issues," making it difficult to assess the status of each taxpayers' non-Kersting related issues and thus "inherently unfair" to "impose upon those petitioners the burden of proving those deficiencies to be erroneous." *Id.* at 47. Furthermore, the court stated that "the non-Kersting issues are relatively minor when compared to the Kersting-related deductions that are at issue in all these cases." *Id.* The court therefore concluded that the appropriate remedy was to eliminate all non-Kersting related penalties, additions, and deficiencies for all affected taxpayers. That determination was not an abuse of discretion.

The Adairs, Owens, and Youngs argue that the Tax Court did not take into account tax benefits Thompson received in tax years 1982 and 1983 in its determination of the denominator in the Thompson settlement fraction, which, by their calculations, allowed Thompson to pay less than two percent of his taxes. This argument is premised on the incorrect assumption that the Commissioner's treatment of Thompson's 1982 tax return was part of the Thompson settlement agreement, as well as on an incorrect calculation of Thompson's savings for tax year 1983.

The argument is based on an August 3, 1989 letter sent from Thompson's attorney, DeCastro, to McWade, which states: "We have agreed that the total taxes due for all the open years are $15,000 for 1980 and $15,000 for 1981." The Tax Court determined, however, that the statutory period of limitations for 1982 had expired in 1986, and therefore Thompson's 1982 taxable year was not an "open year" to which the letter could have applied. Thompson filed his 1982 tax return on May 6, 1983, and on this tax return he claimed Kersting-related tax deductions which reduced his adjusted gross income of $99,362 to $4,336 for tax purposes. No action was taken concerning this tax return, and the statute of limitations under I.R.C. § 6501 expired in May 1986. The settlement which this court held to be a fraud on the court was negotiated on behalf of Thompson by DeCastro, and Thompson did not retain DeCastro as his attorney until November 1986. Therefore, the Tax Court reasonably determined that the Commissioner's failure to act on the 1982 tax return could not have been part of the Thompson settlement agreement between DeCastro and McWade.

The Adairs, Owens, and Youngs also assert that Thompson's 1982 tax year should be considered an "open year" because fraud on the part of Thompson rendered the statute of limitations inapplicable pursuant to I.R.C. § 6501(c)(1). "Fraud implies bad faith, intentional wrongdoing and a sinister motive." *Powell v. Granquist*, 252 F.2d 56, 60 (9th Cir. 1958) (quotation marks omitted). The Tax Court did not find, based on its evaluation of the credibility of Thompson during the evidentiary hearing mandated by *DuFresne*, that Thompson specifically intended to evade a tax known to be owing. There is no evidence that the Tax Court clearly erred in finding that Thompson's 1982 tax year was not an open year to which DeCastro's 1989 letter could have applied. Consequently, the Tax Court's determination that any benefits Thompson received from that year should not be included in the Thompson settlement fraction was not an abuse of the Tax Court's discretion.

The Adairs, Owens, and Youngs also argue that the Tax Court erred in failing to include in its Thompson settlement calculation savings in the amount of $19,717.99 as a benefit for tax year 1983. The Tax Court agreed with the taxpayers that the treatment of tax year 1983 should be included within the benefits obtained by Thompson as part of the settlement.[11] It found, however, that Thompson received a benefit from the settlement of only $980 for tax year 1983. The argument that Thompson received tax savings of $19,717.99 instead of $980 for tax year 1983 erroneously assumes that Thompson had sufficient income for that year to make complete use of his Kersting deductions. He did not. The tax deficiency which he avoided based on the disallowance of $67,620 of Kersting deductions totaled only $980. That is all he actually saved. It was not an abuse of discretion for the Tax Court to use that amount in calculating the benefit obtained by Thompson from the settlement.

[7] The Adairs, Owens, and Youngs argue that the IRS failed to preserve critical documents, including Thompson's 1982 tax return and the administrative files for tax years 1982 and 1983, which would prove that the "IRS granted Thompson audit forbearance for other open tax years not before the Tax Court, allowed all of Thompson's Kersting deductions, and settled the validity of the Kersting deductions, in favor of Thompson, for all open tax years as part of the Thompson settlement." Particularly at a time when tax filings were made on paper rather than electronically, the IRS could not and did not keep all records for all years. There is no evidence that the IRS destroyed documents to cover up its attorneys' miscon-

---

[11]As with tax year 1982, the Commissioner allowed the statute of limitations to expire without collecting the identified deficiency for tax year 1983. Unlike tax year 1982, however, the Tax Court determined that the benefit obtained by Thompson should be taken into account as part of the settlement and included as part of the denominator of its calculation because McWade and the attorney for Thompson were actively involved in discussions at the time the Thompson statutory notice of deficiency for 1983 was being prepared.

duct or to hinder the calculation of the benefits obtained by Thompson. Nor have we been given any reason to believe that the destroyed records would prove any of the taxpayers' assertions. The Tax Court did not abuse its discretion in relying on the materials available to determine the Thompson settlement fraction.

### D.  Discovery Requests

**[8]** The taxpayers also requested that the Tax Court order the production of additional documents by the Commissioner, arguing that these documents were necessary to determine whether there was continuing fraudulent conduct on the part of the Commissioner. The Hongsermeiers filed with the Tax Court a motion for reconsideration of the Tax Court's opinion on remand, asserting that the Commissioner engaged in a continuing cover-up of the fraud and requesting that the Tax Court reopen the record and impose additional sanctions on the Commissioner. In a supplemental opinion responding to the motion for reconsideration, the Tax Court held that the law of the case and our mandate in *Dixon* "preclude[d] [the Tax Court] in the cases at hand from conducting any further inquiry into respondent's misconduct and from imposing any additional sanction . . . ." *Dixon v. CIR*, 92 T.C.M. (CCH) 245, 2006 WL 2577847, at *1. Under the law of the case doctrine, "one panel of an appellate court will not as a general rule reconsider questions which another panel has decided on a prior appeal in the same case." *Kimball v. Callahan*, 590 F.2d 768, 771 (9th Cir. 1979). In *Dixon*, despite taxpayers' claims of continuing fraud on the part of the Commissioner and our awareness of the "persistence and concealment" of the original misconduct, we did not order another evidentiary hearing, as we had in *DuFresne*, but rather ordered the Tax Court to fashion a remedy for the taxpayers equivalent to the Thompson settlement. *Dixon*, 316 F.3d at 1043, 1047. Recognizing that "[e]normous amounts of time and judicial resources have been wasted" and "taxpayers should not be forced to endure another trial," we held in *Dixon* that the

proper solution was a financial remedy and not a further inquiry into the alleged misconduct. *Id.* at 1047.

**[9]** Moreover, following *Dixon*, the Tax Court granted almost all of the taxpayers' discovery requests, amounting to over 200 documents and items described in the IRS's privilege log, "for the limited purpose of ascertaining respondent's understanding of the origins and nature of the Thompson settlement." *Dixon*, 92 T.C.M. (CCH) 245, 2006 WL 2577847, at *5. There was only one exception. Documents listed under Item 123 of the IRS privilege log were reviewed by the Tax Court *in camera*, and the court found they were not directly relevant to its determination of the scope of the Thompson settlement. The Tax Court thus sustained the Commissioner's invocation of the deliberative process privilege for these documents filed under Item 123, which include printed e-mail and facsimile transmissions, memorandums, proposed pleadings and other correspondence created and maintained by the Commissioner's counsel, Henry E. O'Neill, beginning in mid-1992 following the discovery and disclosure of the Thompson settlement and during the course of litigation.

**[10]** Petitioners Rogers, Huber, and Titcomb appeal this denial of disclosure, arguing that the documents filed under Item 123 may contain further information regarding misconduct on the part of the Commissioner. This discovery request exceeds the mandate in *Dixon*, however, for the Court in *Dixon* ordered a financial settlement for the taxpayers equivalent to that offered to Thompson and not further exploration into IRS misconduct or additional sanctions. Based on the Tax Court's mandated role to create a financial settlement for the taxpayers, the denial of the discovery request for materials listed under Item 123 was not an abuse of discretion.

**[11]** Furthermore, the deliberative process privilege permits the government to withhold documents that "reflect[ ] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and

polices are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quotation marks omitted). Documents must be both "predecisional" and "deliberative" to qualify for this privilege; a document is predecisional if it was " 'prepared in order to assist an agency decisionmaker in arriving at his decision,' " and deliberative if its release would " 'expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.' " *Carter v. U.S. Dep't of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002) (quoting *Assembly of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992). The documents listed under Item 123 are both predecisional and deliberative, for the privilege log describes them as materials created during decision-making processes by the Office of Chief Counsel of the IRS over the course of the Kersting project litigation. The Tax Court therefore did not abuse its discretion in determining that the documents were protected by the deliberative process privilege based on the need to protect uninhibited dialogue and deliberations by government agencies. *See Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 979 (9th Cir. 2009) (The deliberative process privilege "shields certain intra-agency communications from disclosure to allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." (internal citation and quotation marks omitted)).

### E. The Tax Court's Imposition of Liability for Interest on the Remaining Deficiencies

**[12]** Under I.R.C. § 6601, interest runs from the date a tax is due to be paid until the date the tax is paid. The Tax Court's determination that taxpayers' tax deficiencies should be reduced by a factor of 63.37 percent thus eliminated their liability for interest with respect to the portion of the tax liability that was eliminated. The Tax Court found, however, that taxpayers remained liable for underpayment of interest on the tax

deficiencies for which they were liable after the application of the Thompson settlement terms.

**[13]** The Commissioner voluntarily agreed to suspend the running of interest on all Kersting taxpayers' deficiencies beginning in June 1992 and remaining suspended until 90 days after the Tax Court entered its judgment on remand.[12] Taxpayers argue, however, that interest should have stopped accruing on their tax deficiencies on December 31, 1986, the date Thompson stopped accruing interest on his tax deficiencies, in order to adhere to the *Dixon* mandate. The question on appeal is thus whether taxpayers remain liable for interest accrued from December 31, 1986 to June 1992, as well as for interest that has accrued to the present starting on September 13, 2007, the date that was 90 days after the Tax Court's decisions were entered in most of the consolidated group of cases that were before the Tax Court on remand, including all petitioners here.

Pursuant to I.R.C. § 6601(a), "[i]f any amount of tax imposed by this title . . . is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate established under section 6621 shall be paid for the period from such last date to the date paid." Although in some circumstances a court may have discretion in determining whether prejudgment interest should be owed, in this context the statute indicates that interest "shall" be paid. *See Grauvogel v. CIR*, 768 F.2d 1087, 1090 (9th Cir. 1985) ("The statute itself provides the means for a taxpayer to stop the interest provision from operating.").

---

[12]The Commissioner's agreement to suspend interest as of June 1992 does not affect the Tax Court's determination of taxpayers' interest due prior to June 1992. This concession was a voluntary, self-imposed sanction, which the Tax Court noted was "an appropriately targeted response to the consequences of [the Commissioner's] former attorneys' fraud on the court, which caused substantial delay in the resolution of the Kersting project cases."

**[14]** The Tax Court found that Thompson paid full interest on his tax deficiencies, as imposed by I.R.C. § 6601(a). While Thompson did stop accruing interest in 1986, this occurred because Thompson paid his interest liability in 1986, not because he received an adjustment to his interest due. It is true that Thompson did not pay the actual deficiencies themselves until six months after he paid his interest liability, but the Tax Court ruled under *Perkins v. CIR*, 92 T.C. 749, 760 (1989), that Thompson's payment of accrued interest was deductible in the year paid even though the underlying tax had not been paid. *See* I.R.C. § 163(a) (permitting deduction of interest without requiring that the underlying obligation be paid); I.R.C. § 461(f) (permitting deduction of interest in the year in which it is paid, even though taxpayer's liability for the underlying debt is contested).

Taxpayers also point to a special feature of the Thompson settlement which allowed a replacement check Thompson paid in February 1987 to be credited as a payment on December 31, 1986. The Tax Court noted this in its opinion on remand, building into the reduced tax deficiency figure for taxpayers the tax benefit received by Thompson as a result of crediting the payment in 1986. The court did not address whether Thompson should have accrued an additional six weeks' worth of interest. Nonetheless, Thompson ultimately received refunds for overpayments made in 1986 and 1987, so it would be illogical to conclude that he had amounts still owing after December 31, 1986.

**[15]** It is true that taxpayers were not offered the benefit of the Thompson settlement terms in 1986. Taxpayers therefore did not have the option to pay their tax deficiencies in 1986 based on the terms offered to Thompson and thus stop interest from accruing on their deficiencies. Nonetheless, this Court's mandate in *Dixon* calling for a settlement that puts taxpayers in the "same position" as Thompson does not require taxpayers' interest be extinguished past 1986, because the Thompson settlement did not involve a cancellation or reduction in

the interest owed by Thompson on his tax deficiencies. Indeed, some taxpayers involved in the Kersting tax shelter and related litigation did make prepayments on their deficiencies to stop interest accruing on their accounts just as Thompson did.

[16] The taxpayers who did not make prepayments continued to receive the economic benefits of their funds, while Thompson lost the use of his funds by paying all tax deficiencies and interest in 1986 and 1987. As the Tax Court noted, taxpayers therefore were granted "the equivalent of an interest-free loan of the reduced deficiencies and interest they will now have to pay." *Dixon*, 91 T.C.M. (CCH) 1086, 2006 WL 1157520, at *28. "Section 6601(a) is not a penalty for late payment but merely compensation for delayed payment in the nature of interest on a loan." *Grauvogel*, 768 F.2d at 1090; *see also United States v. Childs*, 266 U.S. 304, 309-10 (1924) (interest on income tax is "clearly intended to compensate the delay in payment of the tax—the detriment of its nonpayment, to be continued during the time of its nonpayment—compensation, not punishment."). Cancelling taxpayers' interest payments beyond 1986 would accord taxpayers a benefit well beyond that received by Thompson.

## III.  Conclusion

[17] The Tax Court did not abuse its discretion in fashioning a remedy for petitioners. The adjustments set out in the Tax Court decision fairly and reasonably complied with our direction to "put these taxpayers in the same position as provided for in the Thompson settlement," "to the extent possible and practicable." *Dixon*, 316 F.3d at 1047 n.11.

**AFFIRMED.**